```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                     NORFOLK DIVISION


 3

 4  DAVID GRIZZARD,          )
                             )
 5            Plaintiff,     )
                             )
 6  v.                       )      Civil Action No.:
                             )         2:21cv469
 7  LG CHEM, LTD, et al,     )
                             )
 8            Defendants.    )

 9

10          TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS

11            (Motion re Jurisdictional Discovery)

12

                            Norfolk, Virginia
13                          June 23, 2022

14

15  BEFORE:   THE HONORABLE ROBERT J. KRASK
              United States Magistrate Judge
16

17

18  Appearances: (Via Zoom)

19        LEVIN SIMES ABRAMS, LLP
                   By: William Cross
20        -- and --
          LENHART PETTIT
21                 By: Brian Keith Brake
                       Counsel for Plaintiff
22
          NELSON MULLINS RILEY & SCARBOROUGH LLP
23                 By: Rachel Atkin Hedley
                       Jason Ryan Hodge
24                     Counsel for Defendant

25
```

1                    P R O C E E D I N G S

2

3              (Commenced at 11:02 a.m. as follows:)

4

5              THE COURT:  Good morning, everybody.

6              Madam Clerk, if you'll call the case?

7              COURTROOM DEPUTY CLERK:  Grizzard v. LG Chem LTD, et

8    al, Case 2:21cv469.

9              Are the parties ready to proceed?

10             MR. BRAKE:  Yes, ma'am.

11             MR. HODGE:  Yes, Your Honor.

12             MR. CROSS:  Yes, Your Honor.

13             THE COURT:  I'll start just by asking counsel to

14   identify themselves for the record.  We'll start with plaintiff.

15             MR. BRAKE:  Yes, sir.  Good morning.  Brian Brake and

16   William Cross admitted *pro hac vice*.  Pleasure to be before you.

17             THE COURT:  Good morning.

18             And for the defense?

19             MR. HODGE:  Jason Hodge and Rachel Hedley admitted *pro

20   hac vice*.

21             THE COURT:  Good morning to you.

22             MS. HEDLEY:  Good morning, Your Honor.

23             THE COURT:  So I scheduled this hearing today solely

24   to entertain argument on plaintiff's request for jurisdictional

25   discovery.  Counsel were notified by my chambers in advance of

 1  the limited purpose for this hearing, so we will start with

 2  plaintiff.

 3          MR. BRAKE:  Yes, Your Honor.  Thank you very much.  If

 4  I may, William Cross is going to do the presentation this

 5  morning on this issue.  Thank you.

 6          MR. CROSS:  With your permission, Your Honor,

 7  plaintiff would first like to say that this is not a fishing

 8  expedition.  Plaintiff has introduced evidence in support of his

 9  opposition to LG Chem's motion to dismiss that demonstrates

10  contact with Virginia that go beyond bear allegations.

11  Plaintiff maintains that he's alleged facts sufficient to -- or

12  that suggest the possible existence of personal jurisdiction,

13  which is a fairly low bar, and plaintiff's jurisdictional

14  allegations are specific and substantive.

15          Plaintiff has supplied documentary evidence supporting

16  his contention that LG Chem has contact with Virginia sufficient

17  to support personal jurisdiction, and it has also alleged facts

18  that could and would establish that LG Chem has sufficient

19  contact with Virginia to support personal jurisdiction and

20  plaintiff asks for jurisdictional discovery in order to

21  ascertain these facts.

22          For instance, Appendices A and B to the declaration of

23  Nickie Bonenfant, which plaintiff appended to his response in

24  opposition to LG Chem's motion to dismiss used publicly

25  available shipping information based on bills of lading for

1  ships entering the United States through the Port of Norfolk to

2  show that LG Chem shipped lithium-ion batteries to Virginia

3  through Virginia's ports.

4          THE COURT:  Excuse me, Mr. Cross.  Does plaintiff know

5  whether those lithium-ion batteries that were either shipped

6  into Virginia or trans-shipped through Virginia elsewhere into

7  the United States included the 18650 battery that appears to be

8  in dispute in this case?

9          MR. CROSS:  Plaintiff is not aware, because the bills

10 of lading in question do not say what kind of lithium ion

11 battery it is, whether it's an 18650 or a 21700.  They're silent

12 as to that.  And that is one of the reasons why we're asking for

13 jurisdictional discovery, because jurisdictional discovery would

14 reveal, for instance, whether those shipments did in fact

15 contain 18650s, which would confirm or deny the statements made

16 by Mr. Lee in his declaration that claimed that LG Chem never

17 shipped any 18650 lithium-ion cells prior to 2019.

18         And plaintiff also asks for jurisdictional discovery

19 in order to know the full extent of LG Chem's knowledge of where

20 and when its 18650 batteries and other batteries were reaching

21 the U.S. market in general and the Virginia e-cigarette market

22 in particular.  The plaintiff alleges that LG Chem knew or

23 should have known that its batteries were entering those markets

24 since 2015 or 2016, but jurisdictional discovery would reveal

25 correspondence between LG Chem and (audio interrupted) related

1  to LG Chem's knowledge of whether its 18620 batteries were

2  reaching the Virginia e-cigarette market.  And with respect to

3  plaintiff maintains that the Court should not interpret his

4  request for jurisdictional discovery as a fishing expedition,

5  it's really just to ascertain the full picture, because of

6  course much of this information isn't publicly available.  These

7  bills of lading, for instance, are publicly available, but the

8  vast majority of the information that would confirm the very

9  specific factual allegations plaintiff made in his complaint and

10  in his response in opposition to LG Chem's motion to dismiss

11  would -- could and would be confirmed by jurisdictional

12  discovery, Your Honor.

13          THE COURT:  Let me stop you there.  I've got a -- two

14  questions, actually.

15          So you've referenced twice this question of whether or

16  not there is a fishing expedition going on.  What is the

17  standard that applies to the Court's decision whether to permit

18  jurisdictional discovery, and have you satisfied that?

19          MR. CROSS:  It's -- I believe, Your Honor, that

20  it's -- pardon me, I need to...

21          It has to be related to specific facts plaintiff has

22  to -- and again, plaintiff has made specific factual allegations

23  with reference to LG Chem's contact.  And I apologize...

24          THE COURT:  Talk to me about then these appendices

25  submitted by Mister -- I'm not sure if I'm pronouncing his name

1   right -- Bonenfant, B-o-n-e-n-f-a-n-t, I believe, regarding this

2   data that was collected by his firm ImportGenius, which shows

3   that there were numerous shipments by LG Chem into the Port of

4   Norfolk and/or also shipments, I guess is it also to consignees

5   in the state of Virginia and the Commonwealth of Virginia,

6   including the Eastern District of Virginia?

7           MR. CROSS:  That's correct, Your Honor.  Ms. Bonenfant

8   is an employee of ImportGenius, and she provided the declaration

9   which was intended to show that these are -- I mean, this is

10  publicly available information, of course, bills of lading for

11  ships that come into the Port of Norfolk and other ports.  The

12  Virginia consignees are the entities within Virginia to which

13  these shipments were bound where they were not shipped through

14  the Port of Norfolk.  So whether they came in through the Port

15  of Los Angeles or some other port in the United States, if they

16  were in fact eventually bound for Virginia entity, those are the

17  Virginia consignees, and I believe -- let me just confirm

18  this -- that there were, I believe, 58 shipments related to

19  lithium-ion batteries that were revealed in those reports that

20  were to be sent to Virginia consignees.

21          THE COURT:  All right.  I didn't mean to interrupt

22  you.  If you have additional argument I'm happy to hear it.  But

23  let me ask you, so your filing indicates you want limited

24  discovery, you want to depose the declarant, Mr. Lee.  What

25  specific types of discovery do you seek, how long do you think

1  it'll take you to conduct it, recognizing that the Court wants

2  to keep this case moving forward and not, you know, have some

3  huge detour involving massive jurisdictional discovery that may

4  or may not be germane to the question that's before the Court?

5          MR. CROSS:  Your Honor, we would ask for written

6  discovery, including interrogatories, requests for admission and

7  requests for production.  I anticipate that at a minimum we

8  would need 60 days.  That's what we would ask for.

9          As far as the time within which to conduct discovery

10  and, of course, resolve any conflicts we might have after the

11  written discovery obviously we would wish to depose Mr. Lee to

12  determine or to ask both about his knowledge of LG Chem's

13  shipment of lithium-ion batteries into the States and also the

14  extent to which LG Chem may ship batteries to intermediaries

15  that it knows will in turn drop those batteries right into the

16  Virginia e-cigarette market.  So those are the topics that we

17  would like to ask Mr. Lee about, amongst others.

18          THE COURT:  What is plaintiff's position on whether

19  any discovery granted or permitted should be reciprocal?

20          MR. CROSS:  Plaintiff would be amenable to that in the

21  spirit of fairness.  So LG Chem would, of course, be entitled to

22  propound discovery upon plaintiff in turn.

23          THE COURT:  And I don't recall that it's in the

24  amended complaint, but have you been able to identify where

25  Mr. Grizzard, the plaintiff, allegedly bought this battery?

1          MR. CROSS:  We have not, Your Honor.  It's -- his

2   memory is that it -- was to be frank, he can't recall

3   specifically where he purchased it, but he knows that it was in

4   Virginia because he didn't purchase any other battery supplies

5   from outside of Virginia, I believe.

6          THE COURT:  Okay.  Do you have anything further?

7          MR. CROSS:  I do not, Your Honor.

8          THE COURT:  Let me hear from counsel for defendant.

9          MR. HODGE:  Rachel Hedley will be arguing for the

10  defendant, Your Honor.

11          THE COURT:  Okay.  Thank you.

12          Ms. Hedley?

13          MS. HEDLEY:  Thank you, Your Honor.  May it please the

14  Court.  I appreciate the opportunity this morning, Your Honor.

15          And of course plaintiff did not file any motion for

16  jurisdictional discovery or articulate what plaintiff was

17  seeking.  Our position as outlined in the briefs is that we

18  don't believe jurisdictional discovery is necessary.  I will

19  restrict my comments to the Court's questions and comments by

20  counsel; that I understand the Court does not want us to argue

21  the merits of the motion, but just the discovery issue.

22          THE COURT:  Correct.

23          MS. HEDLEY:  So to that point I would like to talk

24  about a couple of things.  First of all, the evidence that LG

25  Chem submitted with its motion directly contradicts the

```
 1  allegations talking about shipping batteries, and in particular
 2  the 18650s that are at issue.  So we introduced admissible
 3  evidence that there were no shipments of 18650s into Virginia
 4  from the time period in the plaintiff's complaint from 2012
 5  until the date of incident, August 20th of 2019.
 6          THE COURT:  Let me ask you about that.  So I read
 7  Mr. Lee's affidavit and supplemental declaration.  I have them
 8  here.  And unfortunately, I guess, I didn't think it was quite
 9  as clear as you just argued.  So in Paragraph 7 of his
10  declaration that's dated April 15, 2022, which was his
11  supplemental declaration, in the second sentence he references
12  Appendices A and B, and he says he's unfamiliar with the format
13  of the charts and cannot verify the accuracy of the information
14  that they contain.  And then, you know, if I read further down
15  the affidavit then he says, well, I can verify that none of the
16  entries of Appendices A or B reflect shipments by LG Chem of
17  cylindrical lithium-ion battery cells including 18650 battery
18  cells.  Those two items don't really seem to work together.
19  One, he says I can't make heads nor tails of what that
20  information that's contained in the appendices but, by the way,
21  I've figured out that the information contained in the
22  appendices demonstrates we didn't submit 18650s -- or didn't
23  sell them or ship them into Virginia.  What am I to make of
24  that?
25          MS. HEDLEY:  Thank you, Your Honor.  I appreciate
```

1  that.  If I could just -- and I will respond specifically to

2  that question, because I think I can shed some light on that for

3  the Court.

4          If I could go back to the original declaration, it's

5  in Paragraph 13 where, at the last sentence, Mr. Lee states that

6  "From the time period 2012 until plaintiff's alleged incident on

7  August 20th of 2019, LG Chem did not have any distributors of

8  its 18650 lithium-ion cells in Virginia" -- and that was alleged

9  in the complaint -- "and did not ship any 18650 ion cells to

10  anyone in Virginia."

11         THE COURT:  Well, let me stop you and ask you right

12  about that.  He doesn't say whether the 18650s were

13  trans-shipped through the Port of Norfolk to other locations.

14  So how am I -- what am I supposed to know about that?

15         MS. HEDLEY:  Well, obviously the argument, our

16  argument in our motion, Your Honor, is that what matters is the

17  contact with Virginia.  And I know the Court does not want me to

18  argue the legal analysis, but the evidence that was put in

19  contradicts the allegations in the complaint where the plaintiff

20  alleges that LG Chem shipped mass quantities of its product into

21  Virginia.  And that was set out in Paragraphs 30 through 32 of

22  the amended complaint.  Didn't specifically say tens of

23  thousands or millions of 18650s, it said tens of thousands of

24  products including the cylindrical lithium-ion battery products

25  at issue here.  So this is in response to a specific allegation

1   in the plaintiff's complaint shipped these particular battery

2   cells to Virginia, and so this is rebutting that saying, no,

3   that did not happen.

4           But if I could go on --

5           THE COURT:  I understand that point.  So can you

6   answer my question though now?

7           MS. HEDLEY:  Sorry.  I do want to make sure that I'm

8   answering.  I wanted to answer the question about the

9   appendices, but if you want me to answer...

10          THE COURT:  Yes.  So I just want to circle back.  His

11  affidavit doesn't say whether the 18650s were trans-shipped

12  through the Port of Norfolk; so they're shipped to Virginia,

13  received in the Port of Norfolk and then trans-shipped elsewhere

14  in the United States.  Did that occur and is there anywhere else

15  in his declarations where he indicates whether that occurred?

16          MS. HEDLEY:  So we did not include that information in

17  support of the motion because our -- again, our argument is that

18  the sales would need to come to Virginia.  If cells entered the

19  United States at a port in Virginia on their way to, you know,

20  Ohio, and this plaintiff purchased them and used them and

21  alleged to be injured in Virginia, then our argument -- and

22  again, I know the Court doesn't want me to get into that --

23  would be that it would not be relevant or support jurisdiction

24  simply because a ship that brought a product from Korea to the

25  United States happened to arrive at a port in Virginia.

1           But if I may, Your Honor, if I may go back to these

2    appendices and talk about that a little bit, because I think

3    that that will answer some of the Court's questions?

4           THE COURT:  Sure.

5           MS. HEDLEY:  So I have seen this chart and its

6    appendix which is supported by this declaration.  So a company

7    called ImportGenius, which is just a private company that anyone

8    could sign up and have a subscription to, and as is explained in

9    the extensive declaration of Ms. Bonenfant, ImportGenius is

10   providing a service where ImportGenius states that they are

11   going around and finding bills of lading and other information

12   of which the best evidence is U.S. Customs records, and typing

13   it into their database and then allowing people to subscribe to

14   that database and then run these Excel charts which are -- I

15   think were provided here on a .pdf but typically available in an

16   Excel, a native Excel that you could navigate that information.

17   And so these are not documents created by LG Chem.  The bill of

18   lading would typically be with a ship vessel or an invoice, and

19   the customer that's importing a product into the United States

20   would fill out Customs declarations and give that to U.S.

21   Customs.  And so this is ImportGenius saying, look, we go around

22   and we get this Customs information, we type them into our

23   database, and you can trust us that it's accurate.

24           And my argument is not focused on the inadmissibility

25   of these records; however they are inadmissible in our view

1 because there's nothing from U.S. Customs verifying the data,

2 and these are not records created by LG Chem.

3         And so to the extent the supplemental declarations

4 says I can't verify these charts, what Mr. Lee is saying there

5 is that this is, this is import information that is somehow

6 reported to U.S. Customs, retained by U.S. Customs, some third

7 party has gone and gathered it, and so I don't know how Mr. Lee

8 would be expected to verify something that has changed hands

9 through the customer in the United States importing it and

10 reporting to U.S. Customs this is what it was, and then U.S.

11 Customs having it in their database and then ImportGenius typing

12 it into their database.  So from an evidentiary standpoint, I

13 hope the Court could accept that not being able to verify that

14 information is not an LG Chem document.

15         But moving on to explain how it is that he could go on

16 to say there's nothing in here that contradicts my statement is

17 because, for example, on Appendix A -- so in the briefing and in

18 the affidavit, plaintiff says that there are, I believe the

19 number was 906 entries, and stated there are 906 entries on

20 Appendix A that show shipment of product by LG Chem into the

21 Port of Virginia.  But then if you go on you see where plaintiff

22 says but actually of those 906 entries, 11 of them are

23 lithium-ion batteries.  11.  And I was able to, and Mr. Lee able

24 to look at that chart -- and Your Honor could do this as well --

25 open up that .pdf and search just for the word "battery", and if

you were to search in the .pdf for the word "battery" you would

find probably these 11 entries, and they would show a

description.  Some of them just say lithium-ion battery, some of

them say lithium-ion polymer battery, then they show an address

and recipient and who they're going to.

THE COURT:  All right.

MS. HEDLEY:  These are public records.  But I'm sure

Your Honor could understand that the locations and identities of

LG Chem's customers is confidential information, and so I'd

prefer and I'm not at liberty to kind of go into detail in an

open public court hearing, but we all have these exhibits.  And

so if you search the exhibit and you see, for example, that it

says lithium-ion -- excuse me, lithium polymer battery and it

shows -- some of the entries show they're going to a car

company.  So even though he cannot verify that that is actually

the correct and accurate representation of the shipment because

it's not LG Chem's record, he can still look at that description

and say a lithium polymer battery is not an 18650 lithium-ion

cell, it's a different type of product.  In addition, that car

company doesn't buy 18650 cells from us.  So even though I don't

know exactly what this chart it, I didn't create it, LG Chem

didn't create it, I can still look at the descriptions that are

given, and looking at those descriptions I can see that those

shipments -- and again if you scroll through, I believe that on

Appendix A, if you were to search for the word "battery" and

1   scroll through them, you would find only two recipients, and one

2   of them is a car company, another one is a company that's

3   identified there on that chart, and neither of them are vape

4   stores, neither of them are in this entry.

5           But also if you look at them, the dates are either

6   hashed out with hashtag marks so it doesn't show the date.  So

7   again, how could he verify that information when it's

8   incomplete, and that's probably because it was in Excel, and as

9   I'm sure Your Honor knows, if you take an Excel and there's data

10  in a field and you don't drag the field wide enough when you

11  print to .pdf, it just prints hashtag marks.  And so I don't

12  have the Excel, I only have the .pdf and I see the hashtag

13  marks.  I do see many of these transactions postdate the injury.

14  Some of them are as late as April 2021.

15          And so in reviewing that Appendix A and reviewing

16  those 11 battery related transactions, I can see -- I can look

17  at the identity of who received it, I can look at our sales

18  records and I can say, no, we didn't ship 18650s to those

19  entities.  And so that's how he can explain that and illustrate

20  to the Court that that's not what those shipments are.

21          Similarly on Appendix B, which I believe is referenced

22  in shipments that came into a port -- which I think is Your

23  Honor's question -- that came in to a port in Virginia but maybe

24  went somewhere else, and again, I think if you, if you look at

25  those -- again, you can search, and I believe that there's

1    one -- there may be one transaction -- you can search these

2    charts for 18650.  And if somebody designated that it was an

3    18650 cell, that would appear in the chart, and I've seen those.

4              There are other states, for example, California, where

5    LG Chem does ship 18650 cells directly to customers in

6    California, equipment manufacturers and battery packers in

7    California.  They come into the California port, they go to the

8    California entities.  And if the plaintiff were to pull a record

9    of that, they would oftentimes reflect an 18650, it just depends

10   on the importer how carefully they describe.  Oftentimes they

11   will put 18650 if that's what it is.  And again, I've seen this

12   in other lawsuits.  I know we have cited in the briefing to

13   other courts that have been grappling with these same issues and

14   so I've seen these before, and they will sometimes say 18650,

15   but often they'll just say battery or battery products.  And if

16   the entry just says battery, that doesn't say a whole lot about

17   what it is, but our witness was able to look at that shipment,

18   look at who it went to, look at the sales data, and say, well, I

19   know that's not an 18650 because we never shipped any 18650s to

20   that entity.

21             But in terms of these shipments, I mean, the Appendix

22   A, 906 transactions, but 11 of them having to do with batteries.

23   And from the dates that I can even see, most them, I believe,

24   are after the date of the incident.

25             And so that's a long explanation, and I hope it

1  answers the Court's question, about both of those issues.

2        So as to the first question I think was is it possible

3  that LG Chem shipped 18650s that came into Port of Virginia and

4  went somewhere else in the United States?  Is that possible?  I

5  don't -- that is possible.  I don't immediately have that

6  information, but I believe that if the plaintiff had it or could

7  find it in these databases, to the extent they're --

8        THE COURT:  I think what plaintiff is -- plaintiff's

9  argument was that they don't know that because the information

10  that -- this ImportGenius stuff is essentially mostly a

11  compilation of government record, you know, regarding imports

12  into the United States.  So it's sort of a form of business

13  intelligence and data that apparently they have compiled and,

14  you know, found it useful to market to others for whatever

15  purposes that they're interested in.  But it doesn't look like

16  the data even for any of these shipments has a detailed

17  description of what was included in each shipping container

18  that's covered by any particular shipment.  So there is some --

19  I would agree with you that, in some instances, there are

20  descriptors that are more detailed than others, but in others

21  the descriptors are very vague and incomplete.  So I don't know

22  how plaintiff would know that information.

23        MS. HEDLEY:  Right.  And so to the extent there's a

24  question about discovery, which, again, our position is that

25  it's not warranted and hasn't established a need, but to the

1  extent plaintiff's argument is we need discovery because LG Chem

2  said they didn't ship cells into Virginia and we have shown you

3  directly contradictory evidence that says oh, yes, they did, I'm

4  simply trying to illustrate for the Court that that is not the

5  case.  There is no evidence that the plaintiff has submitted

6  that contradicts this sworn statement.  So if there were written

7  jurisdictional discover, for example, and an interrogatory or

8  request that says please produce any invoices showing a shipment

9  of 18650 cells from LG Chem, Limited to anyone in Virginia

10  within the time period 2012 until August 20th of 2019, the

11  answer to that request would be none, consistent with the sworn

12  statement that Mr. Lee submitted based on, as he stated in his

13  declaration, based on his review of LG Chem's sales records.  So

14  to the extent the Court has a question about whether or not LG

15  Chem, that statement, that sworn statement is contradicted by

16  plaintiff's exhibits, then of course my position is it's

17  certainly not.  And to the extent the Court wants to allow

18  plaintiff to serve some limited written discovery to ask that

19  question, then the answer will be consistent with his

20  declaration, because it's just simply true.  There were no

21  shipments into Virginia of 18650 battery cells.

22          And so I'd also like to address if I may plaintiff's

23  argument talking about what discovery plaintiff wanted.  He

24  talked about two different things.  One is what were the

25  shipments coming into Virginia, which I think we just talked

1 about at length, and that plaintiff doesn't know exactly what

2 they were.  And I think that if the Court is inclined to allow

3 jurisdictional discovery, that can be handled with some

4 targeted, limited written requests that can be promptly

5 answered.  But then plaintiff went on to say that we would like

6 to know the full extent of LG Chem's knowledge as to when its

7 18650 batteries were reaching U.S. markets in general.  That is

8 an incredibly broad statement, a broad request.  It is not in

9 any way limited to the Commonwealth of Virginia.  It is not in

10 any way limited to the claims at issue in this case.  And again,

11 I know Your Honor does not want me to address the merits of the

12 motion, but I find it a little bit difficult not to respond to

13 the request for discovery without touching at least on the

14 background for the motion, which is that the standard to be met

15 is whether the plaintiff's claims arise out of or relate to

16 contact that LG Chem formed with Virginia.  And I would even

17 refer Your Honor to Footnote 6 in the Wallace case, Wallace v.

18 Yamaha Motors, which is unpublished, but it's the Fourth

19 Circuit's decision earlier this year, in a motorcycle case post

20 Ford talking about how did Ford impact that products liability

21 case, and in Footnote 6 reiterates again that the court reviews

22 only the defendant's -- in that case it was South Carolina --

23 but South Carolina-directed conduct to determine whether the

24 claims arise out of or relate to --

25          THE COURT:  Refresh my recollection, Counsel.  In

```
 1  Wallace did the Court permit some limited jurisdictional
 2  discovery?
 3           MS. HEDLEY:  I believe that was the case, Your Honor.
 4  And I apologize that I don't remember right off the top of my
 5  head.  I know the way the case came up, as Your Honor may
 6  remember, was that the district court granted a motion to
 7  dismiss before the U.S. Supreme Court decided Ford.  And then
 8  the case went up on appeal.  So at that time I think it was very
 9  clear that "arises out of" standard was the only standard, and
10  by the time the case went up on appeal to the Fourth Circuit,
11  the U.S. Supreme Court had decided Ford, and then there was a
12  big discussion about whether Ford changed the outcome, and the
13  Fourth Circuit concluded in that case, I think the facts were
14  undisputed, but it was a South Carolina resident who somehow had
15  gotten this motorcycle from someone, perhaps a friend in South
16  Carolina, but was out of the state at the time, had the injury
17  out of state, and the accident --
18           THE COURT:  I think the accident was in Florida,
19  right?
20           MS. HEDLEY:  Correct.  Yes, Your Honor.
21           So those facts are distinguishable.  But still, in
22  that case the plaintiff argued, well, look, Yamaha sells
23  motorcycles in South Carolina, that's good enough after Ford,
24  and the Fourth Circuit said it's not.  You've got to focus on
25  defendant's conduct directed to this state.  And so that's the
```

1    basis for our argument that jurisdictional discovery, if it's

2    permitted, we believe should be in line with the relevant legal

3    standard.  And so obviously our argument on the question of

4    whether or not knowledge or awareness that these third parties

5    were diverting these cells into an unauthorized market, I mean,

6    that's not in dispute.  And so plaintiff's request for discovery

7    regarding when LG Chem learned how it knew throughout the entire

8    United States for what I anticipate would be for an unlimited

9    period of time is not sort of narrow, limited or in any way

10   focused on contact with Virginia related to this particular

11   product at issue.

12           And so to that point, if the Court were to allow

13   jurisdictional discovery, we would respectfully submit it should

14   be limited in time.  Plaintiff asked for at least 60 days.  I

15   would ask a 60-day limit.  We also would object that it would be

16   premature to decide that a deposition is required.

17           THE COURT:  I'm sorry, could you repeat the last part?

18   I just couldn't hear you.

19           MS. HEDLEY:  I'm sorry, yes.  I said that plaintiff

20   said at least 60 days, and our request would be that plaintiff

21   would be limited to 60 days with instructions to serve any

22   requests in a timely fashion, as the Court says, so we can keep

23   this issue moving and we'd be able to return promptly with a

24   renewed motion to dismiss, as I'm confident we would do.

25           I also said that our position is that there's no basis

1   at this time to order or even to ask for a deposition, which

2   should only be allowed, I think, in a jurisdictional discovery

3   setting, if in fact the written records are somehow unclear or

4   contradictory.  So I didn't they will be, and so we would oppose

5   the request at this time for a deposition as premature and

6   unwarranted on the facts.

7           And so again, our request would be, again, we don't

8   believe there's a basis for jurisdictional discovery, but if the

9   Court is inclined to order, we believe it should be limited to

10  the product at issue in this case, which is the 18650

11  lithium-ion cells and contact with Virginia specifically, and

12  some reasonable time period prior to the plaintiff's incident.

13          Thank you, Your Honor.  If there were other questions,

14  I'm glad to answer them.

15          THE COURT:  Sure.  Does -- if I authorize some limited

16  discovery, does the defense want reciprocal discovery rights or

17  no?

18          MS. HEDLEY:  If I may, Your Honor, I'm not sure that I

19  can answer that at this time.  Ordinarily I would say that my

20  client is not subject to personal jurisdiction and would not

21  affirmatively engage in litigating the merits of the case.  I

22  would note that, you know, these questions about how did this

23  battery get here and what's the supply chain, the supply chain

24  does work in two directions.  And if the plaintiff is not going

25  to conduct discovery from the vape store or the various vape

1   stores or identify the seller of the supply chain, it's sort of

2   difficult for my client to prove a negative, right?  I mean, LG

3   Chem did not supply these vape stores.  How the vape stores got

4   it, I can't know.  That information would come from the vape

5   stores.  And so I would ask, I guess, for the opportunity to

6   consider that, but would appreciate -- and I believe based on

7   plaintiff counsel's comments this would not be disputed -- but

8   that there's no waiver of LG Chem's personal jurisdiction

9   defense if LG Chem were to engage in limited affirmative

10  discovery to get facts related to this jurisdiction motion.  So

11  I would want to make clear if plaintiff's counsel was agreeing

12  that there is no waiver if we proceeded in that way.

13          THE COURT:  All right.  Thank you for that.  I

14  probably would give you an opportunity to consult with

15  plaintiff's counsel about that, and I'll talk more about that in

16  just a moment.  I do want to give plaintiff a chance to respond,

17  but let me ask you, with respect to these import records shown

18  in Appendices A and B, does LG Chem distinguish how it

19  identifies lithium-ion batteries by virtue of whether or not

20  they're packaged in, you know -- or let's say there's a battery

21  pack that was sold that contained, I don't know, 30 lithium-ion

22  batteries and perhaps they're 18650-sized cells.  Is that -- as

23  opposed to, say, the individually shipped, you know, packages

24  containing individual 18650 cells, does LG Chem differentiate in

25  terms of how it identifies those products?  So this kind of goes

1  to what you were telling me about Mr. Lee's statement in his

2  declaration.

3          MS. HEDLEY:  I think I understand the question, so --

4  and if I can just slightly detour to answer the question, so of

5  the lithium-ion batteries, and I mentioned earlier these

6  polymer-type cells.  There are three main types of these cells.

7  One is prismatic and one is a pouch-type, and then there is the

8  cylindrical, the 18650, which, again, is in the declaration.

9  That's the millimeters, 18 millimeters in diameter, 65 in

10 length, then the 0 is cylindrical.  So it's the size of these

11 different types of cells.  LG Chem ships those cells only to

12 entities that are going to pack them in a battery pack, put them

13 into this protective circuitry in some sort of device.  And the

14 way the cells are shipped -- and I think I'm answering your

15 question -- is that there might be occasions where LG Chem

16 itself might send a battery pack that's been assembled and might

17 have multiple cells in it, prismatic battery cells, but the

18 shipping invoice would refer to it as a battery pack, perhaps, a

19 module or a system, an entire system.  If LG Chem were shipping

20 18650 cells, which I'll address in particular because that's

21 what at issue here, they would be in a box, I believe it's boxes

22 of 100, maybe it's 200, and they would go into these pallets in

23 the boxes of 100 to the battery packers or the equipment

24 manufactures who have agreements with LG Chem, who know that

25 they're for, and are purchasing them for the purpose of

1  embedding them with the protective circuitry and putting them in

2  the products.

3       So what the actual shipping invoice says is dependent

4  on the quantity of cells being shipped.  And so I would just

5  sort of throw out a number, if there was a shipment of 500

6  cells, I believe there would be an invoice, a bill of lading

7  that would show LG Chem, Limited as the shipper, it would have

8  the name of the boat, it would have the recipient, and it would

9  illustrate on it how many cells, what was the quantity and

10 price, and that information of course would be proprietary,

11 which, if that's an issue in the jurisdictional discovery, we

12 would just need a confidentiality order and we would consult

13 with plaintiff on that.

14       But what information ImportGenius take from Customs

15 and puts into the database, I don't know.  Like I couldn't tell

16 you how well it matches up, but I could tell you that our

17 witness can certainly look at that chart and kind of get a sense

18 for -- look at the name of the entity, look at the date, and

19 it's not going to match up exactly, but they could look at that

20 and say, okay, I know that company, we do ship polymer cells to

21 them, and can sort of figure it out that way.  But the

22 description that's being put on that ImportGenius chart, I

23 don't -- I don't know who typed that in.  I don't know who

24 chooses what words to put there, I just know that if you look

25 at --

1          THE COURT:  It might be an import broker, you know?

2          MS. HEDLEY:  Right.

3          THE COURT:  It could be any number of people.

4          MS. HEDLEY:  So some might choose to be more specific

5   and you'll see these sort of long entries that are very long,

6   and some of those have 18650s, you see other ones which are

7   clearly a typo, it might say "lithium lithium battery," or

8   "lithium battery battery", or whatever they have typed in.

9   Others might say, you know, synthetic rubber, right?  So those

10  are some of the other types of products.  All different types of

11  petro-chemical names.  Most of those shipments of the 906

12  shipments on Appendix A are petro-chemical products, batteries,

13  and they'll be described that way.  ABS rubber, synthetic rubber

14  or words like that.

15         I hope that answered the question.  I know I...

16         THE COURT:  Yes.  That's helpful.  Thank you.

17         I guess I had a couple other questions relating to

18  this, and you know, one of the issues that is difficult for the

19  Court to assess at this stage is the opaqueness, what I would

20  characterize as the opaqueness of, at least at first glance, of

21  Mr. Lee's declarations, you know, at this stage of the case.

22  And given the Court's limited knowledge of pertinent facts,

23  including some that you've supplied today relating to this

24  matter, but you know, he makes various declarations, but they

25  kind of prompt other questions in the Court's mind.  One of them

is do you know whether any non-Virginia U.S. entities -- and by

that I mean authorized distributors or agents of LG Chem -- made

sales of 18650 batteries or products containing 18650 batteries

into Virginia.  And I'll use his limitation:  Commercial users.

MS. HEDLEY:  So, okay -- so I -- to answer that

question I do want to just preface my comments by saying I think

this case is very unusual in a products liability context.  I

think when there's a personal jurisdiction argument you probably

more typically see a manufacturer who has an authorized

distributor and there might be some dispute about did that

manufacturer, you know, somewhere in Asia who had a distributor

in Georgia, but it was that relationship, and like in the Boto

case from, I think, 2007 that plaintiff referred to where there

was this Chinese manufacturer that had a contract with Walmart

and Target to put their, I think it was artificial Christmas

trees in every Walmart and Target in the country.  So this is

very unusual in that LG Chem, Limited does not -- never did --

supply these 18650 cells to Target or Walmart or these vape

stores as a standalone where they would go to the checkout

counter where you see your AAs and grab some 18650s.  That

didn't happen.  So their U.S. customers were limited to -- there

were distributors in two U.S. states, and those distributors

were authorized to distribute only to battery packers.  And all

the information I have is that that's all they distributed to,

was to battery packers, not to vape stores.  But for example --

1  I would just throw out a hypothetical -- if LG Chem shipped

2  18650 cells to a distributor in Illinois, and that distributor

3  then turned around and distributed those cells to the

4  manufacturer of, I think it's a scooter, for example, which is I

5  think one of the type of products that plaintiff was talking

6  about, so now you have a distributor in Illinois putting these

7  cells into a scooter, and perhaps that battery packer then sells

8  to the scooter manufacturer, and the scooter manufacturer may be

9  in Pennsylvania, and then sells those scooters, and I don't know

10 where you buy electronic scooters, I prefer to walk, but maybe

11 you go to Target or whatever you go, so there's so many

12 intermediaries in that chain, I couldn't tell you -- and it may

13 be the case, I'm sure there are, you know, there may be

14 consumers riding around on scooters in Virginia and that scooter

15 could theoretically be manufactured with an 18650 cell that came

16 by way of a battery pack from somewhere else.  I don't know

17 that.  But I feel like that's a different question than this box

18 of cells that's being shipped to a distributor or an equipment

19 manufacturer or battery packer to be packed in a protective

20 circuitry.

21        So I want to make sure I'm answering that in a way

22 that I hope is helpful to the Court.  I think what we're talking

23 about here is these boxes of cells that LG Chem is shipping,

24 where are they going?

25        THE COURT:  Right.  And where potentially are those

1  authorized distributors and/or agents working with or for LG

2  Chem, where are they're selling, you know, and specifically does

3  that include Virginia customers.  Independent of this whole

4  consumers downstream getting access to some device with the

5  batteries, were the distributors and/or agents working with LG

6  Chem shipping those 18650 batteries to entities in Virginia?

7          MS. HEDLEY:  And so that's why I guess it's a little

8  bit difficult for me to answer the Court's questions about a

9  limit on discovery without reference to the motion itself,

10  because my position would be that even if LG Chem sold 18650

11  cells to a distributor in Illinois who sold them to a battery

12  packer who put them in an e-scooter in, again, hypothetically

13  Pennsylvania --

14          THE COURT:  Let's use Virginia.  Change the

15  hypothetical to a scooter manufacturer -- the distributor's

16  sending the batteries to a scooter manufacturer in Virginia.

17          MS. HEDLEY:  Okay.  So if LG Chem sells a cell to a

18  distributor in Illinois and the distributor in Illinois turns

19  around and sells them to a scooter manufacturer in Virginia and

20  the manufacturer takes those cells, puts them in a scooter and

21  has its manufacturing facility in Virginia, I mean, I still

22  don't think that would support jurisdiction because I don't see

23  how that's related to these claims about buying a standalone

24  battery for a vaping device.

25          And I also, I don't know how LG Chem discovery

1  responses would address that, but I'm sure we can discuss that

2  with plaintiff's counsel.

3          I just -- again, for the record I just wanted my

4  position to be clear that I don't see how that would support the

5  jurisdictional discovery.  So our objection would be to engage

6  in wide-ranging discovery that ultimately has no possibility of

7  supporting the exercise of jurisdiction because there is no

8  suit-related conduct if someone is riding around on a scooter

9  powered by a battery pack that's powered by an LG Chem cell that

10  was shipped somewhere else, but it's a scooter, and it's

11  embedded, and the consumer is never touching it, that's not

12  related to a consumer who walks into a vape store, buys a

13  standalone battery, walks out with it in his pocket and suffers

14  an injury because it was in his pocket and interacted with

15  something else in his pocket.

16          THE COURT:  Let me ask you just one other question.  I

17  appreciate your answer, and obviously the facts aren't really

18  before the Court and we're speculating, really, about what those

19  facts are.  But I do appreciate you trying to help me understand

20  your client's arguments with respect to this matter, and

21  obviously those are going to have to wait for another day.

22          But I'll just throw one other question out there,

23  which at least is prompted:  Did LG Chem authorize 18650

24  batteries to be sold to manufacturers of e-cigarettes or vaping

25  devices?

         MS. HEDLEY:  So LG Chem never authorized that for any

vaping device that was designed to use a standalone replaceable

battery.  And so there is one type of device which I don't

believe was sold in the United States until after the date of

this injury where I believe there's a cell embedded.  The

consumer never sees it, wouldn't even know about it.  But in

terms of these device, these vaping devices that are

manufactured using -- typically in other countries, but they're

designing these vaping devices -- I don't know the particular

type of device that was at issue here, but there are these

vaping devices that are designed by some manufacturer to be used

with a standalone cell.  So you just take it and put the cell in

and either charge the device that way or you take it out and put

it in a charger, put it back in the cell, that's the way these

devices are designed.  LG Chem never, never authorized anyone to

sell its 18650 cells to any manufacturer that was making those

devices.  And in fact -- and again, it has an extensive campaign

warning people against doing this.  Working with the CPSC and

government agencies and various and other actions directed at

consumers to just make -- put out the public information that

these are not designed for this purpose, don't use them that

way, don't buy them that way.  And again, that's tangential to

our jurisdictional argument, it's something plaintiff raised,

but no, I want to answer the Court's question very specifically:

No, LG Chem never authorized anyone to sell its 18650s to anyone

1  that was manufacturing these vaping devices that were designed

2  to be used by taking one of these cells as though it was a

3  standalone battery, putting it in, taking it out, putting it on

4  the charger.  And often that's what causes the problem, because

5  the wrapper, that protective wrapper can get degraded when it's

6  being put in and taken out, put in and taken out, or put in a

7  charger.  People put them in their pocket.  Maybe there's keys

8  in their pocket.  Maybe there's something else metal in the

9  pocket.  Now you've got that degraded wrapper, some other metal

10 touches the degraded, exposed part of the cell, and that's what

11 causes the runaway in most instances.

12         THE COURT:  Okay.  Thank you very much, Ms. Hedley.

13         I'll be happy to hear plaintiff briefly.

14         MR. CROSS:  Yeah.  Yes, Your Honor.  I'd just like to

15 say that we do not oppose the confidentiality order should Your

16 Honor grant us the opportunity to conduct jurisdictional

17 discovery, nor would we consider any engagement in the discovery

18 process by LG Chem to be a waiver.

19         We would just -- I would just like to say that I heard

20 mention of, you know, these bills of lading not being sufficient

21 because they're not produced by LG Chem.  That's part of the

22 reason we're asking for jurisdictional discovery, to get those

23 documents that plaintiff can't access because they're not public

24 that would show whether or not these bills of lading actually

25 references the 18650s.

1    And I did ask for communications related to LG Chem's

2  knowledge.  One of the reasons that I asked for that is that in

3  plaintiff's amended complaint, I believe in Paragraph 34,

4  plaintiff did allege that LG Chem sells non-conforming

5  batteries, 18650s, to entities in China that it knows to then

6  resell them into the United States e-cigarette market including

7  the Virginia e-cigarette market.  And I know that LG Chem will

8  probably object to this and advocate for a very narrow discovery

9  process, but I would like to specifically request that

10  discovery -- or that we be allowed to propound discovery that

11  contemplates their commerce with those Chinese entities that

12  plaintiff has alleged that LG Chem sells its batteries to with

13  the knowledge that they enter the e-cigarette market in the

14  United States and specifically in Virginia.

15    And I believe that's all I have, Your Honor.

16    THE COURT:  Okay.  Thank you, Counsel.

17    The Court is going to exercise its discretion to

18  permit limited jurisdictional discovery directed to

19  identification of facts pertaining to whether specific

20  jurisdiction exists over LG Chem, Limited in this case.

21    I note that the plaintiff has already conceded that

22  general jurisdiction over LG Chem does not apply.  It doesn't

23  appear there's a dispute about that.

24    I find that the information that plaintiff supplied to

25  the Court, particularly the shipping data suggesting LG Chem

1   made numerous shipments into the Port of Norfolk and/or to

2   Virginia consignees, including shipments of lithium-ion

3   batteries, though perhaps the nature and type and kind of those

4   batteries remains to be determined, coupled with what, at this

5   stage, given the Court's limited information, given the limited

6   information that's before the Court but coupled with sort of the

7   opaque nature of Mr. Lee's declaration and his supplemental

8   declaration that were submitted by LG Chem, causes me to

9   conclude that a factual basis does exist here for jurisdictional

10  discovery.

11          Stated another way, simply, plaintiff's need for

12  discovery and the basis for seeking it rises above the level of

13  mere speculation.

14          So what I'm going to do is direct the parties to meet

15  and confer promptly on the question of the scope, nature and

16  time frame for what you have repeatedly described today as

17  limited discovery, recognizing that this case needs to move

18  forward consistent with Rule 1's direction that the Rules be

19  applied in a manner so as to facilitate the just, speedy and

20  inexpensive determination of actions that are brought in federal

21  courts, and also in recognition of this Court's regular practice

22  of moving cases promptly and quickly so that we can allow

23  parties to have their disputes addressed and resolved in a

24  prompt fashion.

25          So if the parties can agree, they are to file a joint

1  motion addressing their joint request concerning the scope,

2  nature and time frame of such limited discovery.  If the parties

3  cannot agree on a joint proposal, then they each must submit

4  separate proposals specifying what each party proposes

5  concerning the kind of discovery to be allowed and the timeframe

6  for its completion.

7           I'm going to direct -- and I'll issue an order today

8  memorializing what I've just said -- but the joint and/or

9  separate proposals to the Court -- and they're just proposals,

10  the Court will ultimately make its own judgment about what

11  discovery is appropriate -- shall be filed no later than 5 p.m.

12  on Monday, June 27th, 2022.  So you're going to need to meet and

13  confer before that.  And given what we're talking about in this

14  case and the facts that you've described and discussed in the

15  complaint and in the declaration and in the motions, I think you

16  know what you need to get your arms around to address the

17  question that's before the Court in the motion to dismiss, and I

18  don't think an extended time period is necessary for that.

19           I will direct the parties also to submit a proposed

20  protective order to the Court for its consideration -- or motion

21  for entry of a protective order.  And it would be very helpful

22  that you could agree on a proposed order and submit that to the

23  Court, and I'll direct that also be submitted by Monday the 27th

24  not later than 5 p.m.

25           Also, the parties' joint or separate proposals shall

1  also include a proposed schedule for briefing any renewed motion

2  to dismiss by LG Chem incorporating the results of the

3  jurisdictional discovery.

4          So I intend to recommend to Judge Smith that, in light

5  of my ruling today, that the pending motion to dismiss be denied

6  without prejudice subject to renewal following the completion of

7  this jurisdictional discovery.

8          So once I receive the proposals -- or proposal or

9  proposals from you I'll issue a ruling next week addressing the

10  limited discovery and schedule moving forward.

11          MS. HEDLEY:  Your Honor, may I ask a quick question?

12          THE COURT:  You may.

13          MS. HEDLEY:  Does the Court contemplate a schedule for

14  briefing -- we can discuss this, but does the Court have a

15  preference to a sort of renewed motion response reply to the

16  original motion or just supplemental briefs by each side?

17          THE COURT:  I think probably my preference is going to

18  be for a renewed motion that will deny what's out there now,

19  since the facts are not, to my judgment, sufficiently joined,

20  and following that jurisdictional discovery then we can start

21  fresh.  And I assume you probably won't have to make substantial

22  revisions to your motions, and the arguments, the arguments will

23  be the same.  I'm certain the question will be what is the

24  significance of any additional facts that are discovered to the

25  question of specific jurisdiction in the case.

 1          MS. HEDLEY:  And if I may, Your Honor, one more

 2   question?  I apologize.  But with the motion denied without

 3   prejudice, leave to refile, would the Court's order address that

 4   the time to answer is stayed until after the renewed motion is

 5   ruled upon?

 6          THE COURT:  You can submit that as part of any

 7   proposals to the Court and I'll consider that, certainly.

 8          MS. HEDLEY:  Okay.  Thank you.

 9          THE COURT:  Anything further that I can do for you

10   today?

11          MS. HEDLEY:  Not for us.  Thank you, Your Honor.

12          MR. CROSS:  No thank you, Your Honor.

13          MR. BRAKE:  Thank you very much, Your Honor.  It's

14   been a pleasure.

15          THE COURT:  Thank you everyone.  Have a good day, and

16   I'll look forward to receiving your proposals next week.

17          Court will be in recess.

18          (Whereupon, proceedings concluded at 11:57 a.m.)

19

20

21

22

23

24

25

*CERTIFICATION*


    *I certify that the foregoing is a true, complete and correct transcript of the proceedings held in the above-entitled matter.*


_____

Paul L. McManus, RMR, FCRR

_____

Date